# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION

### CIVIL CASE NO. 2:01-cv-00019-MR

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. KAREN T. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| | ) | |
| GRAHAM COUNTY SOIL & WATER | ) | |
| CONSERVATION DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the parties' supplemental pleadings filed pursuant to the instruction of this Court after the remand from the United States Court of Appeals for the Fourth Circuit, United States ex rel. Wilson v. Graham County Soil & Water Conservation District, et al., 399 F. App'x 774 (4th Cir. 2010).

## PROCEDURAL HISTORY

The United States Supreme Court summarized the procedural history of this case as follows:

> In 1995 the United States Department of Agriculture (USDA) entered into contracts with two counties in

North Carolina authorizing them to perform, or to hire others to perform, cleanup and repair work in areas that had suffered extensive flooding. The Federal Government agreed to shoulder 75 percent of the contract costs. Respondent Karen T. Wilson was at that time an employee of the Graham County Soil and Conservation District, a special-purpose government body that had been delegated partial responsibility for coordinating and performing the remediation effort. Suspecting possible fraud in connection with this effort, Wilson voiced her concerns to local officials in the summer of 1995. She also sent a letter to, and had a meeting with, agents of the USDA.

Graham County officials began an investigation. An accounting firm hired by the county performed an audit and, in 1996, issued a report (Audit Report) that identified several potential irregularities in the county's administration of the contracts. Shortly thereafter, the North Carolina Department of Environment, Health, and Natural Resources issued a report (DEHNR Report) identifying similar problems. The USDA's Office of Inspector General eventually issued a third report that contained additional findings.

In 2001 Wilson filed this action, alleging that petitioners, the Graham County and Cherokee County Soil and Water Conservation Districts and a number of local and federal officials, violated the False Claims Act (FCA) by knowingly submitting false claims for payment pursuant to the 1995 contracts. She further alleged that petitioners retaliated against her for aiding the federal investigation of those false claims. Following this Court's review of the statute of limitations applicable to Wilson's retaliation claim, Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 125 S.Ct. 2444, 162 L.Ed.2d

390 (2005), the Court of Appeals ordered that that claim be dismissed as time barred. 424 F.3d 437 (C.A.4 2005). On remand, the District Court subsequently dismissed Wilson's *qui tam* action for lack of jurisdiction. The court found that Wilson had failed to refute that her action was based upon allegations publicly disclosed in the Audit Report and the DEHNR Report.[1] Those reports, the District Court determined, constituted "administrative ... report[s], ... audit[s], or investigation[s]" within the meaning of the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A).

The Court of Appeals reversed the judgment of the District Court because the reports had been generated by state and local entities. "[O]nly *federal* administrative reports, audits or investigations," the Fourth Circuit concluded, "qualify as public disclosures under the FCA." 528 F.3d 292, 301 (2008) (emphasis added). The Circuits having divided over this issue, [the Supreme Court] granted *certiorari* to resolve the conflict. 557 U.S. __, 125 S.Ct. 823, 160 L.Ed.2d 609 (2009).

Graham County Soil and Water Conservation Dist. v. U.S. *ex rel.* Wilson, 559 U.S. 280, 130 S.Ct. 1396, 1400-01, 176 L.Ed.2d 225 (2010). In resolving that conflict, the Supreme Court held that the reference to "administrative" reports, audits, and investigations in § 3730(e)(4)(A) encompasses disclosures made in state and local sources as well as federal sources. Id. at 1398. Finding the Fourth Circuit's interpretation

---

[1] This Court, in its earlier decision in this matter, also considered the report of the USDA Inspector General, which report is referred to in the Supreme Court's recitation. [Doc. 274 at 46-55]. Since that is a federal report, there was no question before the Supreme Court as to whether it was a source which would bar jurisdiction as to claims derived therefrom.

3

erroneous, the Supreme Court reversed and remanded to the Fourth Circuit "for further proceedings consistent with" its opinion. Id.

On remand, the Fourth Circuit acknowledged the Supreme Court's ruling "that the public-disclosure bar is not limited to federal reports and audits, but also applies to reports, audits, and the like conducted or issued by state and local governments." Wilson, 399 F. App'x at 775.

> The Supreme Court's opinion, of course, establishes the scope of the public-disclosure bar. The Court's opinion, however, does not affect our previously expressed view that a remand to the district court is required before we can consider the substance of Wilson's claims. As is relevant to this case, the public-disclosure bar strips courts of jurisdiction over FCA actions that are "based upon the public disclosure of allegations or transactions in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." As noted in our prior opinion, the district court did not make the necessary factual findings to establish that Wilson's claims were "based upon" any of the reports at issue in this case. The district court likewise failed to make the requisite findings to establish that the reports at issue were in fact publicly disclosed. Given the jurisdictional nature of the public-disclosure bar, these subsidiary issues must be resolved before we can proceed to consider the merits of the Wilson's FCA claims.

Id. at 775-76.

The Fourth Circuit thus instructed this Court[2] to make the necessary factual determinations as to (1) whether the relevant federal, state or local governmental audits, reports, hearings or investigations were publicly disclosed; (2) whether Wilson's claims were based on those public disclosures; and (3) if both of these requirements have been met, reconsider whether Wilson qualifies as an original source for any claim. Id. The Court of Appeals also directed that "the district court shall permit the parties to submit additional evidence as may be necessary for the court to make the factual determinations upon which the jurisdictional questions turn." Id. at 776.

Upon the most recent remand by the Court of Appeals, this Court conducted a status conference at which all parties appeared. At that conference, the parties advised the Court that there was no dispute as to the facts underlying the question of subject matter jurisdiction. [Doc. 338 at 1]. They further stipulated that in the event the Court determined there to be any such conflict in the evidence that this Court should make any necessary findings of facts based on the evidence in the record without any further hearing. [Id. at 2]. The Court therefore entered an amended pretrial order which established deadlines by which the parties were allowed to

---

[2] Upon the retirement of Judge Thornburg, the case was reassigned to the undersigned.

submit any additional evidence pertinent to the question of jurisdiction. [Id. at 2-4]. The parties having done so, [Docs. 342-1 through 342-9, 345-1 through 345-4, 347-1 through 347-5, 351-1 through 351-6], this matter is ripe for determination.

## THE THIRD AMENDED COMPLAINT

The only remaining claims are ones asserted pursuant to the False Claims Act based on the allegations set forth in Section A of the Third Amended Complaint filed July 31, 2006.[3] [Doc. 184]. The Relator, Wilson, was a part-time secretary for the Graham County Soil and Water Conservation District (Graham County District) beginning in 1993.[4] [Id. at 5]. As recounted by the Supreme Court, after extensive flooding caused substantial damage in Graham, Cherokee, and Clay Counties in far western North Carolina in February 1995, the federal government developed a program known as EWP-216, which was established by a grant pursuant to the Emergency Watershed Protection Program (EWP). [Id.]. In her Complaint[5] Wilson alleges the following as having violated the

---

[3]By virtue of previous rulings, these are the only remaining claims. [Doc. 122, Doc. 189, Doc. 213]. The parties apparently do not dispute this fact, as these are the only claims they have briefed. [Docs. 341, 342, 345, 347, 348, 349, 350, 351, 352].

[4]Although Wilson brought this *qui tam* action as a relator, the United States declined to intervene. [Doc. 8].

[5] References herein to the Complaint are to the Third Amended Complaint of July 31,

FCA. Defendant Keith Orr (Orr) was employed as an inspector for the Graham County District. Orr presented claims for payment for work he asserted he had done in Graham and Cherokee Counties. These claims, however, are alleged to be improper because Orr had a conflict of interest due to his employment with the District and because the contracts for the work had been placed with Orr without any bids having been sought or received. Wilson also alleged that Orr "had not performed some or any of the work for which he filed claims for payment and for which he was paid." [Doc. 184 at 6 ¶ 31.e.]. It is alleged that the other Graham County Defendants[6] are liable for such improper claims and payments because they facilitated and covered up such wrongful acts. [Id. at 5-6].

Wilson alleged a second category of wrongful claims by Defendants Orr, Richard Greene and William Timpson. Greene and Timpson were employees of the USDA who were responsible for inspecting work on EWP-216 repairs. Wilsom alleges that these three Defendants took the logs that were cut in relation to the EWP-216 clean up and sold them for

---

2006, Doc. 184.

[6] The "Graham County Defendants" include the Graham County Soil & Water Conservation District (Graham County SWCD), Graham County, Graham County SWCD Supervisor Gerald Phillips, Graham County SWCD Supervisor Allen Dehart, Graham County SWCD Supervisor Lloyd Millsaps, Graham County Commissioner Dale Wiggins, Graham County Commissioner Raymond Williams, and Graham County Commissioner Lynn Cody.

their personal profit, even though those logs had become the property of the USDA as a result of the clean up efforts.[7]  [Id. at 6-7].

In a third category, Wilson alleges that Orr, Greene and Timpson, along with Defendant Billy Brown "conspired to make similar false claims under the EWP-216 program for Clay and Cherokee Counties and split the proceeds from the false claims." [Id. at 7 ¶ 31.j.].  Wilson did not specify to which Graham County claims the Cherokee and Clay County claims were similar.  She asserts, however, that the Cherokee County Defendants,[8] along with Lloyd Kisselburg, now deceased, facilitated and covered up the fraudulent acts.  [Id. at 8-9].  Lastly, Wilson asserts that the governmental defendants from both Graham and Cherokee Counties did these acts to curry political and personal favor with Orr, Brown, Greene and Timpson. [Id. at 9 ¶ 31.o.].

Based on these allegations, Wilson claimed the Defendants violated the False Claims Act by knowingly presenting to the United States Government false or fraudulent claims, knowingly making false records in

---

[7] Relator does not actually allege that the logs were government property, only that the sales took place and resulted in "illegal proceeds." [Doc. 184 at 7 ¶ 31.g.].  Construing the allegations in the light most favorable to the Relator as the non-moving party, the Court interprets this to be an allegation that the logs were government property.

[8] The "Cherokee County Defendants" include the Cherokee County Soil & Water Conservation District (Cherokee County SWCD), Cherokee County SWCD Supervisor Bill Tipton, Cherokee County SWCD Supervisor C.B. Newton, and Cherokee County SWCD Supervisor Eddie Wood.

order to obtain payment of false claims, and conspiring to defraud the Government by such acts.

## FACTUAL BACKGROUND

The Court of Appeals remanded for consideration of three issues: (1) whether the reports at issue were publicly disclosed; (2) whether Wilson's claims are based on those reports; and (3) whether Wilson was an original source.[9]  The facts pertinent to those issues are as follows.  First, however, an overview of the EWP programs is essential to understanding these issues.

The responsibility for administering the EWP programs on a nationwide basis falls on the National Resources Conservation Service[10] (NRCS).  [Doc. 226-2 at 4-7].  Jacob Crandall (Crandall), an NRCS employee, was the area conservationist for 29 counties in western North Carolina during the time at issue.  [Id.].  When a natural disaster occurred in one of his 29 counties, Crandall and his engineer would assess the

---

[9]As discussed in further detail below, the Fourth Circuit did not limit its ruling to the so-called Audit Report.  See Wilson, 399 F. App'x at 775-76.  The parties, however, limited their proposed findings of fact and conclusions of law to that report.  [See Docs. 350, 351, 352].

[10] Originally established by Congress in 1935 as the Soil Conservation Service, the National Resources Conservation Service is a federal agency that provides conservation planning and assistance to landowners.  See www.nrcs.usda.gov/wps/portal/nrcs/main/national/about/.html (last visited Sept. 25, 2013).

damage from the standpoint of emergency watershed protection. [Id. at 7]. If the county requested participation in an EWP program, the state conservationist, who was also a NRCS employee and Crandall's supervisor, made the decision whether to send the request for approval to NRCS in Washington, D.C. [Id. at 7-8]. If approved, it was Crandall's job to obtain estimates for repairing the damage. [Id.]. These repairs were to be performed pursuant to agreements, called "local contracts," between NRCS and the local agency. [Id. at 8]. Per NRCS regulations, when a local contract was a "performance of work agreement"[11] the local agency had the option of using its own employees to do the work or contracting with a party outside of the agency to do it. [Id. at 18]. Regardless of whether the county decided to contract out the work, there was no requirement that the county seek and obtain bids on the contract. [Id.]. There was also no federal or local policy which prevented a county or district employee from performing the work, provided such was done outside of his regular job. [Id.]. It was, nonetheless, the responsibility of federal employees of NRCS to certify that the work was properly performed and done in compliance with the contract. [Id. at 8-13]. Therefore, no

---

[11]A "performance of work agreement" pursuant to NRCS regulations allows a county to perform the work through its own employees or to enter into an agreement with the local soil and water conservation district to perform the work. [Doc. 226-13].

payment for work could be made until the government representative and inspector, both of whom were federal NRCS employees, provided such certification. [Id.].

On June 5, 1995, Graham County entered into Project Agreement 69-4532-5-650 (the 650 Project) with NRCS.[12] [Id. at 15-17]. The 650 Project was a "performance of work agreement"; therefore, it was proper for Graham County to enter into an agreement with Graham County District pursuant to which the District would do the work and there was no requirement to seek bids.[13] [Id. at 18; Doc. 226-2]. Orr, who was an employee of the Graham County District, performed this contract outside of his normal work duties and hours for the District. [Doc. 226-6 at 14-15]. Because of the nature of the contract, pursuant to the NRCS regulations there was no irregularity in Orr doing so. [Id.].

Howard Tew, who was Crandall's engineer, also testified that the purpose of the "performance of work agreements" was to allow the local agency to do the work with their own forces. [Doc. 226-7 at 5]. Tew testified

---

[12]Although Graham County also entered into another project agreement with NRCS, the Relator does not allege any false claims in connection with that agreement in the Third Amended Complaint [Doc. 342-3].

[13]Graham County submitted Standard Form 270 to NRCS to seek reimbursement from federal funds for the amounts paid to Graham County District. [Doc. 342-2]. NRCS officials reviewed the forms for compliance with NRCS rules and regulations and if proper, approved them for reimbursement. [Id.].

that when he learned that Orr was doing the actual work on the Graham County 650 Project, there was discussion as to whether this amounted to a conflict of interest. [Id. at 5-7]. He testified that there was no problem so long as Orr either performed the work as part of his regular job for no extra pay, or performed the work on his own time separate from his regular duties on a contract basis for extra pay. [Id.]. He came to the conclusion that allowing Orr to do the work was permissible under the terms of the agreement between NRCS and Graham County as well as under the terms of the "performance of work agreement" between Graham County and the Graham County District. [Id.]. In fact, under the terms of the "code of conduct" which was provided as a prerequisite to the EWP program, Orr was not prohibited from doing the work. [Id.]. Tew also testified that bidding was not required under a "performance of work agreement." [Id.].

The Cherokee County Board of Commissioners entered into a performance of work agreement, Project Agreement 69-4532-5-640 (the 640 Project) with the NRCS in May 1995. [Doc. 221 at 2-6, 28]. This agreement also arose from the flooding which occurred in western North Carolina in February 1995. Because the 640 Project was a "performance of work agreement," Cherokee County properly entered into an agreement with the Cherokee County District pursuant to which the District would

perform the work and bidding was not required.  [Id. at 28].  On June 26, 1996, Tew, in his capacity as an NRCS employee, certified that final inspection of the project had occurred and all work had been properly completed.  [Id. at 29-30].  On July 11, 1996, Tew, again acting as a NRCS employee, submitted to the contracting officer for Cherokee County the forms for final payment.  [Id.].

Minutes of Graham County District Board meetings show that Greene (also an NRCS employee) reported to the Board (1) in July 1995 that Orr was interested in doing the 650 Project work, (2) in September 1995 that Orr and Brown would be doing the work and (3) in October 1995 that Brown had signed a contract.[14]  [Doc. 261-1 at 38].

Sometime prior to December 1995, Wilson told Dale Wiggins, a commissioner for Graham County, that there was a problem with the administration of the EWP-216 Project.  [Doc. 342-5 at 7].  Wilson acknowledged that the minutes of the Graham County District do not reflect that she informed Wiggins of those problems at any point in 1995.  [Id.].  When asked during her deposition what she had told the Supervisors, Wilson responded, "I'm not sure.  To some degree I'm sure I told them

---

[14] It should be noted that Wilson alleges Brown only acted with regard to the Clay and Cherokee County work, not Graham County. [Doc. 184 at 7 ¶ 31.j.].

about it.  But I don't know that I specifically verbatim told them exactly that."
[Doc. 342-7 at 3].

On December 7, 1995, Wilson wrote a letter to Richard Gallo (Gallo), Special Agent with the Office of Inspector General for the USDA.  [Doc. 342-8 at 2].  In that letter, Wilson stated that she had been "contacted and ask[ed] to send documentation of my concerns to you."  [Id.].  She then goes on to recount various allegations against Greene that are not the subject of the claims in this action.[15]  In the letter, Wilson candidly admitted that Graham County was "now being audited by county auditors."  [Id.].  Wilson goes on to assert that Orr had admitted doing some of the work on the EWP-216 Project and dividing the profits therefrom with Timpson and Brown.  [Id.].  She stated, however, that the "*auditors informed me* that Keith [Orr] as a salaried employee should of [sic] never received these funds."  [Id.] (emphasis added).  She went on to say that the County was misinformed and kept in the dark about the Project and the funds.  [Id.].  Wilson also claimed that because Greene had done the billing for the EWP-

---

[15] Wilson accused Greene of "cost sharing" funds allocated by the North Carolina Agriculture Cost Share Program for an entity known as "G&L Farms."  [Id.].  Wilson believed that this farm was a partnership between Greene and his wife and another couple and that the application for those funds had not been signed by the owners.  [Id.].  There are many references throughout the evidence to supposed improprieties by Greene concerning G&L Farms and regarding the sale of "filter fabric."  There are, however, no allegations in the Complaint regarding any claims related to these issues, and they do not appear to have anything to do with the EWP Projects.

216 Project, he gave her the figures that the Graham County District had billed to Graham County. She claimed that she could not reconcile the bills and that "[t]his is when the auditors come into the picture." [Id.]. Wilson has neither alleged nor explained why Greene, a federal employee, would have shared those figures with her, a part time secretary not responsible for finances.

In December 1995, Crandall removed both Greene and Timpson from their official duties in connection with the EWP program based on a recommendation from Tew. [Doc. 226-2 at 29].

Wilson testified in her deposition that sometime in 1995 or 1996, she spoke with an employee of Crisp Hughes & Co., LLP who was performing an audit for Graham County. [Doc. 342-2 at 5-6]. Wilson testified that the accountant did not tell her much of anything although Wilson did "share files" with her when she came in to do the audit. [Id. at 6]. Wilson requested a copy of the audit from Graham County. [Id.]. Wilson testified that when she reviewed the audit, it merely verified information which she already knew. [Id.].

In March 1996, an Agreed Upon Procedures Report[16] for Graham County was performed by Crisp Hughes & Co., LLP, for the period March

---

[16] An "agreed upon procedures report" is an informal audit which provides answers to

27 through November 8, 1995 (the Audit Report). [Doc. 342-6]. According to the Audit Report, the procedures were performed to determine that "the books and records of Graham County have been adequately maintained." [Id.]. The audit was performed as a review of Graham County's expenditure of the federal funds at issue pursuant to the EWP-216. [Id.]. The report included the following comments:

> It was noted that contract terms [for the 650 Project] relating to cost of rip-rap, area to be seeded, cribbing assembly, and specification of the organization to perform the actual work as specified in the original project agreements for [the 650 Project contract] obtained in the Graham County files did not agree to [sic] the copy obtained from the USDA NRCS Waynesville District office.
>
> . . .
>
> We noted several instances where invoices submitted to the County for payment were extended incorrectly, causing the County to pay more than the invoice details supported.
>
> . . .
>
> Requests for reimbursement were not supported by invoices or other documentation dated prior to the date of the reimbursement request.
>
> . . .
>
> Certain portions of the [650 Project] were completed by an individual who was an approved project inspector. This appears to be a violation of the County's code of conduct which was submitted in

---

specified questions concerning financial records and issues. In re Holcomb Health Care Services, LLC, 329 B.R. 622, 666 (Bkr. M.D. Tenn. 2004).

certifications as prerequisite to establishing project agreements with the USDA.

[N.C.]G.S. 143-131 requires contracts for construction or repairs costing from $5,000 to $50,000 be awarded in accordance with an informal bidding process. The statute requires that a record of all such bids be kept. No documentation was available to indicate that informal bid requirements had been complied with.

[Id. at 6-7].

Sometime after April 26, 1996, Sharon Crisp Holloway (Crisp), who was the Finance Officer for Graham County, received a copy of this audit along with a cover letter addressed to her in her official capacity. [Doc. 257-14]. In the letter, sent by a Crisp Hughes accountant, it was noted that a copy of the audit had also been sent to the Local Government Commission and the North Carolina Division of Soil and Water Conservation in the care of Donna Moffitt. [Id. at 3]. Additional copies of the audit were enclosed for distribution to Graham County, the Graham County District and the USDA. [Id.]. The audit itself was addressed to the Graham County Board of Commissioners. [Id. at 5]. Crisp has provided an affidavit in which she stated that "about this time," she had conversations with Wilson in which Wilson expressed concern about the legality of payments to Orr. [Id. at 1].

On November 14, 1996, Levourn Wiggins,[17] in his capacity as government inspector, wrote to Tew, in his capacity as the government representative for the EWP-216 project, and made the following observations:

> The following is submitted to you as information you can use to process the final payment for the Performance of Work for agreement #69-4532-5-650, to the Graham County Commissioners. I am in no way verifying that all the work reported prior to the time that I was assigned Construction Inspector, was done as reported. The facts point out that there are several discrepancies in what was reported and what was actually done, and/or what materials were used. Existing records that I have access to indicate the following information is accurate.

> Seeding:
> Keith Orr's last bill to the Graham County [District] for seeding and mulching was for 105,000 sq. ft. at $27 per 1000 ft., for a total of $2835.00. Graham County found errors in the bills Keith Orr turned in. Keith had charged for $631.26 too much on his bills. This means there was 23,380 sq. ft. of seeding turned in that was not done. The county also subtracted $241.50 from Keith Orr's bill because some landowners said that either no seeding was done on their property, or they did it themselves. There are other landowners who have indicated inconsistences in the amount of seeding done on their property and/or the materials used. This is an additional 8944 sq. ft. of seeding not done for a total of 32,324 sq. ft. of seeding that was turned into

[17] Levourn Wiggins was an inspector for NRCS and should not be confused with Defendant Dale Wiggins who was a Graham County Commissioner. (see p. 17 n.6, supra).

NRCS as being completed, but actually was not done.

**. . .**

Driving Cap:

> Very strong evidence exists that a driving cap for Graham County never existed. The [Graham County District] board asked Keith Orr to refund the money he was paid for this item. Keith has not paid back this money and the matter has been turned over to the NC Attorney Generals Office.

…

Filter Cloth:

> The Graham County [District] bought 6 rolls of filter cloth on 7-28-95. . . . [It appears] that only 500 sq. yds. (1 roll) of filter cloth was used on the cribbing project instead of 2500 sq. yds. (5 rolls).

[Doc. 226-11 at 34-35].

Wilson provided a statement to USDA Special Agent Golec on November 14, 1996. [Doc. 255-1]. That statement primarily consisted of allegations against Greene regarding the G&L Farms and filter fabric issues. In that statement, however, Wilson also made the following accusations:

1.    From January 1993 through December 1995, the Graham County District agreed to allow Greene, who was employed by the NRCS, to handle the day-to-day supervision of the Graham County District.

2. Greene did not explain to the Graham County District Board what the procedure was for bidding out contracts for the EWP Projects.

3. When Wilson received an invoice from Orr in June 1995, she told Greene that she could not pay Orr because he had a conflict of interest.

4. No contract existed for the work which Orr did until December 1995 at which time a contract first appeared.

5. Sharon Crisp had alleged that Greene and Orr attempted to force Crisp to tear up the billing paperwork for some of Orr's work.

6. Greene would help Orr with preparing his invoices for the seeding work and then approved the payment of Orr's invoices for work done.  Wilson also accused Orr of performing work while on duty for Graham County District.

7. Orr, Greene, Timpson and Brown improperly performed the 640 Project for the Cherokee County District.

[Id.].

In January 1997, Lavina West (West), who was at the time the bookkeeper for a lumber mill called Valwood Corporation (Valwood),

responded to a federal subpoena from Roger Viadero, Inspector General for NRCS. [Doc. 262-1 at 15]. She provided records in response to the subpoena for all payments made by Valwood for the purchase of lumber from Greene and Orr during the time period at issue. [Id.]. At that time, she had not been contacted by Wilson and had not provided any information to Wilson. [Id.]. In February 2002, Wilson contacted West and requested the same information, which West then provided to her. [Id.].

On August 13, 1997, Agent Golec issued his Report of Investigation on behalf of the USDA (the USDA Report) encompassing the same time period as involved in this action. [Doc. 261-1 at 8-16]. The report contains a discussion of the agent's findings in connection with the removal and sale of logs in connection with Cherokee County's 640 Project. [Id.]. Agent Golec concluded that Greene improperly received payment from Valwood for the delivery of trees removed from the EWP sites. [Id. at 10]. Agent Golec included the names of his sources for this information in his report and Wilson was not included as a source. [Id. at 10-16].

Wilson claims that the four Standard Form 270s submitted for payment in connection with the Graham County 650 Project were false because (1) no bidding for the project occurred; (2) Orr was prohibited from performing the work because of a conflict of interest arising from his

employment; (3) some of the work certified was not actually performed. The allegations as to the Cherokee County 640 Project and the submission of Standard Form 270s for payment from the federal government are limited to the Valwood purchase of timber.

## DISCUSSION

**The jurisdictional bar.**

> When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence. Unless the jurisdictional facts are intertwined with the facts central to the merits of the dispute, the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits.
> …
> In the case at hand, 31 U.S.C. §3730(e)(4) sets forth the jurisdictional facts of which Relator … [bears] the burden of proving by a preponderance of the evidence[.] Once Defendants challenged the district court's subject matter jurisdiction under §3730(e)(4), … Relator …first bore the burden of proving that the allegations underpinning [her] FCA claims were not "based upon" the [publicly disclosed reports]. If [she] carried this burden, §3730(e)(4)(A)'s public disclosure jurisdictional bar would not apply. However, if [she] failed to carry this burden, [she] then bore the separate and distinct burden of proving [herself] entitled to original source status, which burden required [her] to prove that [she] was "an individual who has direct and independent knowledge of the information on which

the allegations [in the Third Amended Complaint] are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir.) (internal quotation marks and citations omitted), cert. denied, 558 U.S. 875, 130 S.Ct. 229, 175 L.Ed.2d 129 (2009).

The Court of Appeals specifically remanded this matter for the consideration of three questions pertinent to the jurisdictional bar: (1) whether the reports were publicly disclosed, (2) whether Wilson's claims were derived from those reports, and if so (3) whether Wilson qualifies as an original source of those claims. Wilson, 399 F. Appx. at 775. [Doc. 329 at 5].

A. PUBLIC DISCLOSURE

With regard to whether the reports at issue were publicly disclosed, it is the law of this case "that the public-disclosure bar is not limited to federal reports and audits, but also applies to reports, audits, and the like conducted or issued by state and local governments." Id. at 775. [Doc. 329 at 3]. "[T]he public-disclosure bar [thus] strips courts of jurisdiction over FCA actions that are based upon the public disclosure of allegations or transactions in a congressional, administrative, or Government Accounting

Office report, hearing, audit, or investigation." Id. Therefore it is uncontested that the Audit Report, the DEHNR Report, and the USDA Report each qualifies as a source specifically identified in the statute, § 3730(e)(4)(A).[18] Id.; United States ex rel. Wilson v. Graham County Soil & Water Conservation District, 559 U.S. 280, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010).

Next, the disclosure must have been public prior to the filing of the Complaint. Id. at 307. Public disclosure requires that it be accessible to the general public, made to strangers to the alleged fraud or placed in the public domain. United States ex rel. Beauchamp v. Academi Training Center, Inc., __ F.Supp.2d __, 2013 WL 1189707, at *10 (E.D. Va. Mar. 21, 2013). Here, the Defendants argue that the Audit Report was made accessible to the general public and also placed in the public domain because it was provided to Graham County, the Local Government Commission, and the Division of the North Carolina Soil & Water Conservation. [Doc. 347 at 2-4].

_____

[18]As noted previously, in May 1996, the DEHNR issued a Report following its investigation of the North Carolina Agricultural Cost Sharing Program and the involvement of Greene, Timpson, Brown, G&L Farms and others with improprieties in connection with that program. Although the DEHNR Report qualifies as a report under the False Claims Act, the allegations set out in the Third Amended Complaint do not contain any claims related to this program. [Doc. 184]. The Court therefore will not address it further.

The public disclosure requirement is meant to "preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction[s] had they chosen to look for it as it was to the relator." United States ex rel. Stinson v. Prudential Life Ins. Co., 944 F.2d 1149, 1155-56 (3[d] Cir. 1991). "The likelihood that the information will be brought to the federal government's attention is heightened in cases like this where the audited program is connected significantly to federal regulations and funds." United States *ex rel.* Bly-Magee v. Premo, 470 F.3d 914, 918-19 (9th Cir. 2006), cert. denied, 552 U.S. 1165, 128 S.Ct. 1119, 169 L.Ed.2d 948 (2008). Indeed, Graham County, as the recipient of federal funds pursuant to the EWP program, was required to file a financial audit with the federal government. See 31 U.S.C. § 7502(c). It was, moreover, required to transmit that audit to a federal clearinghouse and to make it available for public inspection. See 31 U.S.C. §7502(h). Crisp Hughes, as the independent auditor, was also required to report to the federal government any non-compliance with federal rules and regulations discovered in the course of the audit. See 31 U.S.C. § 7502(g). Indeed, multiple copies of the audit report were sent for submission to the USDA. Further, it is undisputed that the audit report was provided to the Local

Government Commission,[19] the North Carolina Soil & Water Conservation Commission,[20] and the Graham County Board of Commissioners.[21]   It is also undisputed that the audit was sent to Graham County in March 1996. It was thus publicly disclosed as of that date.   See Battle v. Board of Regents for Georgia, 468 F.3d 755, 762 (11th Cir. 2006) (holding that audits required by state auditors due to receipt of federal funding were publicly disclosed when made).   As of that time, the Audit Report clearly put the federal government on notice of a potential fraud and it provided "easily accessible notice … from which an investigation could have begun or developed."   United States ex rel. Black v. Health & Hosp. Corp. of Marion County, 494 F. App'x 285, 294 (4th Cir. 2012) (citing and quoting Graham County, 559 U.S. 280, 130 S.Ct. at 1404); United States ex rel. Jones v.

---

[19]The Local Government Commission is "a statutorily established state agency, with the responsibility for overseeing local government finance.   Its responsibilities include approving … accounting practices of local governments."   Wayne County Citizens Ass'n for Better Tax Control v. Wayne County Bd. Of Comm'rs, 328 N.C. 24, 33, 399 S.E.2d 311 (1991).

[20]The North Carolina Soil & Water Conservation Commission is a state agency with responsibility for establishing soil and water conservation districts which are governmental subdivisions of the State.   N.C. Gen. Stat. §§ 139-4, et seq.

[21]The Court rejects Wilson's argument that such disclosure was not an "affirmative act of disclosure" because disclosure to a governmental agency cannot be disclosure in the public domain.   In support, she cites United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514 (10th Cir. 1996).   The Ramseyer case, however, involved an investigation by an agency employee, a report of his conclusions and placement of that report in a confidential file access to which was not available to the public.

Collegiate Funding Services, 469 F. App'x 244 (4th Cir. 2012). "Disclosure of information to a competent public official about an alleged false claim against the government [is] public disclosure within the meaning of [the False Claims Act] when the disclosure is made to one who has managerial responsibility for the very claims being made."[22] United States v. Bank of Farmington, 166 F.3d 853, 861 (7th Cir. 1999), overruled on other grounds, Glaser v. Wound Care Consultants, Inc., 570 F.3d 907 (7th Cir. 2009). Such was the case here.

Indeed, Wilson admits that she both requested and received a copy of the Audit Report in 1996. This fact alone shows public disclosure. The Court therefore finds and concludes that the Audit Report was publicly disclosed.

Agent Golec of the USDA also provided a Report of Investigation (the USDA Report) on August 13, 1997. [Doc. 261-1]. The USDA Report was distributed to the NRCS, the Office of General Counsel for USDA, the North Carolina State Bureau of Investigation (SBI), and the United States Attorney for the Western District of North Carolina. [Id. at 8]. NRCS was

---

[22] The Court rejects Wilson's argument that disclosure to a government agency cannot constitute public disclosure. In so arguing, she cites United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720 (1st Cir.), overruled on other grounds Allison Engine v. United States ex rel. Sanders, 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008). In that case, the disclosure was a confidential disclosure made by Pfizer itself to the government without any further disclosure. That is factually inapposite to this case.

the federal agency involved with the EWP projects.  [Id. at 9].  The Report was disclosed to the NRCS Chief and Deputy Chief for Management and Strategic Planning.  [Id. at 8].  As noted above, "[d]isclosure of information to a competent public official about an alleged false claim against the government [is] public disclosure . . . when made to one who has managerial responsibility for the very claims being made."  Bank of Farmington, 166 F.3d at 861.  The Court therefore finds this report was also publicly disclosed.[23]

## B. WHETHER THE CLAIMS ARE DERIVED FROM PUBLIC REPORTS

Having answered the first question in the affirmative, the Court next considers whether Wilson's claims are based on or derived from the Audit Report and/or the USDA Report.[24]  "A relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which [her] *qui tam* action is based."  United States *ex rel.* Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1348 (4th Cir.), cert. denied 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d

---

[23] The Court notes that in her brief to this Court on the issue, Wilson does not even advance an argument that the USDA report was not publicly disclosed.  This alone is seen as a concession by Wilson that it was, in fact, publicly disclosed. [Doc. 345].

[24] The Court applies the law as it existed at the time this action was filed, that is, prior to the 2010 amendment to the False Claims Act.  See Jones, 469 F. App'x at 255.

278 (1994), <u>superseded by statute as stated in</u> <u>Black v. Health & Hosp.</u> <u>Corp. of Marion County</u>, 494 F. App'x 285 (4th Cir. 2012).

A comparison of the allegations in the Third Amended Complaint and the public documents is very telling. Wilson alleges that false claims were made by Orr and paid and facilitated by the Graham County Defendants related to the EWP-216 projects in that (1) Orr was not a proper recipient because he was and approved inspector for and employee of Graham County District and therefore had a conflict of interest; (2) that Wilson was instructed to pay Orr's invoices "whether or not Orr had done the work or not [sic]" [Doc. 184 at 6] and Orr had not, in fact, done some of the work for which he obtained payment;[25] (3) Orr, Greene and Timpson took government property, namely logs harvested from the EWP projects, and sold them for their personal gain; (4) as pertaining to the Cherokee and Clay County contracts, Wilson simply alleges that Orr, Greene, Timpson and Brown made "similar false claims" [Id. at 7] with the complicity of the Cherokee County Defendants;[26] and (5) some unspecified claims were

---

[25] Wilson makes allegations that no documentation was kept of one of Orr's contracts and that Crisp paid one of the checks to Orr "under protest." Nowhere does Wilson assert that the failure to maintain such documents is actionable, or that the "protest" gives rise to any false claim. As such the Court takes these allegations as Wilson simply "pleading the evidence" rather than asserting additional claims.

[26] Wilson does not even state whether this claim pertains to claims that are improper because of any conflict, or because of payments for work that was not performed, or

improper because they were pursuant to contracts that were required to be placed for bid, but no bids were taken.

The first claim is clearly covered by the Audit Report, which reads "Certain portions of the project were completed by an individual who was an approved project inspector. This appears to be a violation of the County's code of conduct which was submitted in certifications as prerequisite to establishing project agreements with the USDA." [Doc. 342-6 at 7 ¶ 2]. The second claim, asserting payments for work that was not completed is likewise specifically addressed in the Audit Report. [Id. at 6 ¶ 3]. The fifth claim, Wilson's very vague allegation of "claims . . . for payments based on claims for which there was no bidding although bidding was required under the program," [Doc. 184 at 9 ¶ 31.n.], is also directly addressed in the Audit Report: "G.S. 143-131 required contracts for construction or repairs costing from $5,000 to $50,000 be awarded in accordance with an informal bidding process. The statute requires that a record of all such bids be kept. No documentation was available to indicate that informal bid requirements had been complied with." [Doc. 342-6 at 7 ¶ 3].

---

resulting from theft of government property.

The question, of course, is whether Relator's claims are "based upon" the Audit Report. The similarity between the information in the Audit Report and Relator's allegations is strong evidence of Relator having derived her claims from the Audit Report. Vuyyuru, 555 F.3d at 351. Particularly telling of Relator's reliance on the Audit Report is the fact that where the Audit Report is vague, Wilson's allegations are also vague. Most convincing, however, is how the allegations in the Third Amended Complaint mirror the limitations of the Audit Report. The audit was conducted only for Graham County. Hence, when Relator makes allegations concerning the EWP program in Cherokee County her allegations completely lack any specificity and are limited to a statement that the Defendants "conspired to make similar false claims," i.e., similar to the false claims asserted regarding Graham County – which were drawn from the Audit Report. Wilson claims that she derived this information from simply being in her office at Graham County, overhearing conversations, and talking with the secretary of the Cherokee County District. Her only proof of this, however, is her own affidavit and her deposition testimony, neither of which is sufficient to carry her burden of proof on this point. See United States ex rel. Gear v. Emergency Medical Associates of Illinois, 436 F.3d 726, 729 (7th Cir. 2006) (finding that relator's affidavit saying that his

complaint was based on his personal observations and experience insufficient to counter weighty evidence).

Wilson, moreover, admitted on numerous occasions that she obtained information from the auditor and ultimately obtained a copy of the Audit Report. [Doc. 342-5; Doc. 342-8]. The auditors, she admitted, were the ones who told her that Orr could not perform this work due to his position with the District (even though it appears in the record that this conclusion was quite possibly incorrect). [Id.]. Public records, such as minutes of Graham County District Board meetings, show that Greene reported to the Board in July 1995 that Orr was interested in doing the 650 Project work, in September 1995 that Orr and Brown would be doing the work and in October 1995 that Brown had signed a contract. [Doc. 261-1 at 38]. Wilson, however, makes no allegation regarding the Graham County 650 Project concerning Brown. This appears to be because the Audit Report fails to mention any involvement by Brown regarding Graham County. [Doc. 184 at 7]. Wilson's insistence that her Complaint is based solely on her personal observations and deductions "is insufficient to counter the weighty public record, which it is difficult to believe [Wilson] did not notice, especially because" of her position as secretary. Gear, 436 F.3d at 729.

Wilson offers no explanation for the similarities between her allegations in the Third Amended Complaint and the contents of the Audit Report. Such similarities serve as "significant proof" that the substantive allegations were actually derived from the Audit Report. See Vuyyuru, 555 F.3d at 351.[27] "Faced with evidence of public disclosures and no reasonably inferable sources other than" Wilson's affidavit and deposition testimony, the Court must find that the allegations of the Third Amended Complaint are based on the Audit Report. See id. The Court therefore finds that Wilson has failed to carry her burden to prove by a preponderance of the evidence that her claims related to the Graham County 650 Project are not based on the Audit Report. See Black, 494 F. App'x at 295; Jones, 469 F. App'x at 255-56 (stating that although relator is not required to prove source of information, mere denial of knowledge of public disclosures does not satisfy the burden of proof).

Wilson's fourth claim, regarding the sale of the logs, is not addressed in the Audit Report. This, however, forms a substantial portion of the USDA Report. In fact, this issue was also the subject of Greene's federal

---

[27]The Vuyyuru court actually held that the public disclosure bar encompasses actions based even partly on prior public disclosures. Id. While the Court could easily find that Wilson's claims are "partly based" on the Audit Report, it finds that they are actually derived from and based on the Audit Report. See United States ex rel. Black v. Health & Hosp. Corp. of Marion County, No. RDB-08-0390, 2011 WL 1161737, at *7 (D. Md. Mar. 28, 2011).

indictment in 1998, which is a public record. [Doc. 261-1 at 3-5; Court file 2:98cr083, Count I].[28]  Wilson's allegations in the Complaint regarding the timber sales extend to the trees harvested in conjunction with the 640 (Cherokee County) Project as well as the 650 (Graham County) Project. [Doc. 184 at 6-7].  The proceeds from those sales, it is alleged, were then distributed among Greene, Timpson and Brown.  [Id.].  It is further alleged that the Cherokee County supervisors then tried to conceal these payments.  [Id.].

Wilson's letter in December 1995 to Gallo did not contain any allegations concerning this conduct.  [Doc. 342-8].  Wilson's statement provided to Agent Golec in November 1996 was as follows:

> I heard in the office from . . . Greene that the trees/timber that had fallen down after the flood along river beds and [that] were to be used in cribbing structures had been stolen.  I mentioned this to . . . Orr in his . . . office in 1995, approximately 2 or 3 days after . . . Greene told me of the theft, and [Orr] told me that . . . Greene had done away with them and he did not know who Greene had sold them to.

[Doc. 256-3 at 6].

In the statement to Golec, Wilson did not identify the Cherokee 640 Project and she made no reference to trees being sold to Valwood.  [Doc.

---

[28] The indictment also included charges pertaining to G&L Farms and the filter fabric. [Doc. 261-1 at 3-5].

256-3]. Indeed, in Agent Golec's report, he does not identify Wilson as a source of information concerning his conclusions about the sale of the trees to Valwood and the division of profits from those sales. [Doc. 261-1 at 8-16]. He does, however, report at length that beginning in May 1995, trees taken from the 640 Project were taken to Valwood and sold. [Id. at 13]. The checks for the trees were made out to Greene, Orr and Brown. [Id.]. Golec's sources for this information were individuals who worked for the Cherokee County District and/or for Cherokee County, or who served on the District Board. [Doc. 261-1 at 13-15]. One of those sources told Golec that he had learned of Greene's actions in connection with the sale of fallen timber in the summer of 1996, prior to Wilson's November 1996 statement to Golec. [Id.]. Likewise, Greene gave a statement to Golec in October 1996 in which he candidly admitted the sale of the timber to Valwood and the issuance of checks from Valwood to him. [Id.]. The bookkeeper for Valwood has provided an affidavit in which she stated that NRCS subpoenaed her records in early 1997 and she provided them. [Doc. 262-1]. Those records showed payments by Valwood to Greene, Orr and Brown during the time of the Cherokee County District 640 Project. [Id.]. That same bookkeeper has averred that Wilson did not contact her about

any such records until 2002, well after the publication of Agent Golec's report and one year after Wilson filed this suit. [Id.].

Again, the similarities between Agent Golec's report and the allegations in the Complaint are "remarkable." See Vuyyuru, 555 F.3d at 350-51. For the same reasons as stated above, the Court concludes that Wilson has failed to carry her burden of proof to show that these allegations were not based on the USDA Report.[29]

In light of the information set out in the Audit Report, the USDA Report and the Greene indictment, the only thing Wilson independently provides in her Complaint are the check numbers, dates and amounts of the payments. She adds nothing regarding the liability, basis of liability or potential liability of any Defendant. For these reasons the Court finds and concludes that all Wilson's allegations are derived from the Audit Report, the USDA Report and the indictment.

## C. WHETHER WILSON WAS AN ORIGINAL SOURCE

Having failed to carry the burden to show that the public disclosure bar should not apply, Wilson now bears the "separate and distinct burden of proving [herself] entitled to original source status," which requires her to

---

[29]Indeed, Wilson did not discuss the USDA Report at all, either in the original response to Cherokee County's Motion for Summary Judgment or in the supplemental filings. She has therefore conceded the issue.

prove that she was "an individual who has direct and independent knowledge of the information on which the allegations [in the Third Amended Complaint] are based and has voluntarily provided the information to the Government before filing an action . . . which is based on the information." Vuyyuru, 555 F.3d at 348-49. Moreover, at the time relevant to this case, the information to which the statute "speaks refers to the information on which relator's allegations are based, not upon the information on which the publicly disclosed allegations that triggered [the] public disclosure jurisdictional bar are based." Id. (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 471-72, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007)). In other words, Wilson has the burden of showing that she is the original source of the information giving rise to her allegations, not that she was the original source of the public reports.

Knowledge is direct if it is acquired through the relator's own efforts, without any intervening agency, and it is independent if the knowledge is not dependent on public disclosure. Grayson v. Advanced Mgmt. Tech. Inc., 221 F.3d 580, 583 (4th Cir. 2000). A relator must have direct and independent knowledge sufficient to establish each of the elements of a False Claims Act cause of action. Vuyyuru, 555 F.3d at 353. A relator cannot satisfy this burden by submitting affidavits containing conclusory

statements.  <u>United States ex rel. Davis v. Prince</u>, 753 F.Supp.2d 569, 589 n.28 (E.D.Va. 2011).

The Court first considers whether Wilson has carried her burden to show that she was an original source of the information disclosed in the Audit Report of March 1996.  "Although [Wilson] need not trace the flow of information from herself to the [auditor] to the … audit report[,] [a ruling against her will] be proper [if she] fail[s] to provide the district court with specific facts showing that she had direct and independent knowledge of the audit findings on which she bases her FCA claims."  <u>Battle</u>, 468 F.3d at 762-63.

In her affidavit, Wilson claims that she was appointed to be an inspector for the 650 Project but admits that she never inspected any of the work performed.  [Doc. 345-1 at 2].  In what manner she therefore knew that the work had not been performed or had not been performed properly is not explained.  The Audit Report, however, notes the lack of compliance with the work specified in the files contained in the NRCS office.  [Doc. 257-14].

Wilson claims that when she received an invoice to pay Orr in June 1995, she refused to pay it, telling Greene that it was a conflict of interest for Orr to do the work because he was a District employee.  [<u>Id</u>.].  In her

letter to Gallo in December 1995, however, Wilson stated that the "*auditors informed me* that [Orr] as a salaried employee should [have] never received these funds."  [Doc. 342-8 at 2] (emphasis added).  The Audit Report itself makes the same statement.  [Doc. 257-14].

Wilson alleged that the work to be done under the 650 Project was required to be bid out but Greene never instructed the Graham County District that this was necessary.  [Doc. 345-1 at 1-4].  The Audit Report contains the same conclusion.  [Doc. 257-14].  Every federal employee involved in the Project, however, testified that bidding was not required under a work project agreement.  [Doc. 274].

Wilson claimed that she alerted Wiggins to problems with the project in 1995.  [Doc. 345-1].  The minutes of meetings of the District, however, do not reflect any such reports and Wilson has admitted this.  Although she claimed that she was sure she told them "something," she could not recall what.

Wilson admitted that she provided files to the auditors, with whom she spoke, and that she subsequently requested and received a copy of the Audit Report.  [Id.].  Her knowledge, Wilson claims, is from her position as a secretary, her conversations with Orr, Greene and Bates and in "reading and preparing the EWP documents and checks."  [Id. at 3-4].

Wilson has failed, however, to show that she acquired her knowledge without the intervening agency of the Audit Report and that her knowledge was independent of that public disclosure. "While relators are not required to affirmatively prove the source of their information for FCA allegations, … mere denial of knowledge of public disclosures does not satisfy the burden established by" the law. Jones, 469 F. App'x at 255.

As for Wilson's claim based on the illegal sale of timber to Valwood, Agent Golec in his USDA Report disclosed numerous sources for his information. Wilson, however, was not one of them.[30] Chad Decker, a Cherokee County District employee, told Golec that as early as July 1995, Greene instructed him to haul tree debris to Valwood. [Doc. 261-1 at 13]. Decker and Timpson, a NRCS employee and the inspector for the 640 Project, both hauled loads of timber to Valwood in July 1995. [Id.]. Indeed, the job diary kept by Timpson as the inspector for the 640 Project shows that Decker was "hauling off scrap wood" and Valwood records from the same time period show payment to Greene for the timber. [Id.]. Jerry Ware was a Cherokee County employee in the summer of 1995. [Id. at 14.]. He told Agent Golec that he was instructed by Timpson to haul timber

---

[30] Wilson at no point has identified the illegal sale of timber to Valwood as involving the Cherokee County 640 Project. Golec identifies some forty sources of information for his report. Wilson is listed, but not as having provided anything pertaining to the timber sales. [Doc. 261-1 at 24, 29, 37]. Rather, her statements pertain to G&L Farms and the sales of filter fabric, neither of which are alleged in the Complaint.

to Valwood.  [Id.].  Mike Hawk, Chairman of the Cherokee County District Board, told Agent Golec that in the summer of 1996 he learned that wood had been sold to Valwood the previous summer.  [Id. at 261-1].

Wilson claimed in her November 1996 statement provided to Agent Golec that at an unspecified time in 1995, Orr told her that Greene had stolen trees which were to be used for cribbing but he did not know to whom Greene had sold them.  [Doc. 256-3 at 6].  Wilson did not identify any project with which this was connected and did not specify in what manner a fraudulent claim was made to the federal government.  She therefore failed to establish an element of a FCA claim.  See Vuyyuru, 555 F.3d at 353; Davis, 753 F.Supp.2d at 583.  Moreover, the fact that Orr allegedly told Wilson about this shows that she was not the original source because he was an "intervening agency."  United States ex rel. Ahumada v. National Center for Employment of the Disabled, No. 1:06-cv-713, 2013 WL 2322836, at *6 (E.D. Va. May 22, 2013).  Indeed, as shown in the USDA Report, no effort was made to hide the sale of the wood and at least three individuals, one of whom was the NRCS inspector, knew about it.  Timpson even recorded the sales in the 1995 job diary.  Wilson's "mere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry [her] burden of proving that [she] is entitled to original

source status." Id.  She must have alleged specific facts, not conclusions, showing exactly when and how she obtained direct and independent knowledge of the fraudulent act alleged in the complaint.  See United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162-63 (10th Cir. 1999).  Those allegations, moreover, must be supported with competent proof.  See id.  During Wilson's deposition on the issue of the source of her knowledge concerning the Cherokee County District, Wilson finally stated that since the work was not properly performed by Orr in Graham County, "I would have to say if it stinks in one bed, it probably stinks in the other bed."  [Doc. 222-2 at 72].  This is insufficient to prove that Wilson was the original source of the fraud allegations in connection with the 640 Project (Cherokee County).  See Black, 494 F. App'x at 296.

Wilson's responsive argument on this score is merely that there was no public disclosure of the fact that Greene illegally sold the timber, thus, information which she gleaned from her position as a secretary proves that she was the original source.  Wilson's argument completely ignores the USDA Report; and, indeed she does not address it at all.  Wilson's failure to address the disclosure of this information in the USDA Report serves as additional support for the Court's conclusion that Wilson has failed to carry her burden to show that she had direct and independent knowledge of

these allegations. Even more telling, however, is that Greene was indicted for selling the logs. That indictment was handed down eight years before Wilson filed her third Amended Complaint. [Doc. 261-1 at 3, Court File 2:98CR083]. Greene took the matter to trial and was convicted by a jury. [2:98CR083 at Doc. 12, 19]. Wilson's argument that she simply "must" have been the original source of information that was publicly aired in a public court proceeding years earlier simply escapes understanding.

Having concluded that the jurisdictional bar deprives this Court of subject matter jurisdiction, the Court must dismiss this action.

## O R D E R

**IT IS, THEREFORE, ORDERED** that this action is hereby **DISMISSED** for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Signed: October 1, 2013

Martin Reidinger
United States District Judge